IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLYDE GREEN, | : | CIVIL NO. 1:CV-12-00982 |
| | : | |
| **Plaintiff** | : | (Judge Rambo) |
| | : | |
| v. | : | |
| | : | |
| WARDEN JON FISHER, et al., | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M

Plaintiff Clyde Green, an inmate currently confined at the State Correctional Institution at Smithfield ("SCI-Smithfield") in Huntingdon, Pennsylvania, initiated this civil rights action pursuant to 42 U.S.C. § 1983 with a *pro se* complaint on May 24, 2012, as amended May 1, 2013.  (Doc. 44.)  Plaintiff has also asserted pendant state law claims of negligence.  Named as Defendants are two medical providers at SCI-Smithfield ("Medical Defendants"), as well as a number of Department of Corrections ("DOC") employees located at SCI-Smithfield ("DOC Defendants").[1]  In the amended complaint, Plaintiff alleges that he sustained injuries on two separate instances at SCI-Smithfield and has since been denied adequate medical care.  As relief, he seeks compensatory and punitive damages.

---

[1]  The Medical Defendants are Christina Doll and Ronald Long.  A previously-named Defendant, Corizon, Inc., was dismissed as a party in this action pursuant to the court's disposition of a previously-filed motion to dismiss.  (*See* Doc. 66.)  The DOC Defendants are as follows: Jon Fisher, Rebecca Sue Hannah, William Dreibelbis, James Fouse, William Felton, and Tim Rohrer.

Presently before the court are two motions for summary judgment, filed by both sets of Defendants.  (Docs. 79 & 92.)  For the reasons set forth below, the motions will be granted.  In addition, the court will decline to exercise supplemental jurisdiction over Plaintiff's pendant state law claims.  Those claims will be dismissed without prejudice to Plaintiff's right to pursue them in state court.

## I.    Background

### A.    Facts

The following facts are related to Plaintiff's claims.  The court notes any factual disputes between the parties by presenting both parties' contentions.

The instant action arose during Plaintiff's incarceration at SCI-Smithfield in September and October 2011.  (Doc. 94 ¶ 2.)  With respect to the first instance alleged in the amended complaint, Plaintiff alleges that, on September 30, 2011, he entered the dining hall to eat, picked up his food tray, and was directed to sit "at what was obviously an unstable table."  (Doc. 44 ¶ 15.)  When Plaintiff sat down at the table, it snapped from its floor foundation, and Plaintiff fell to the floor.  (*Id*.; Doc. 94 ¶ 52.)  In an attempt to break his fall, Plaintiff injured his wrist and left hand, and struck the back of his head.  (Doc. 44 ¶ 16.)  He also felt immediate pain in his lower back and

buttocks.  (*Id.*)  DOC Defendants assert that Plaintiff reported hurting his right arm, and that staff noticed mild swelling to his right arm and wrist.  (Doc. 94 ¶¶ 53, 54.)

DOC Defendants provide the following background with respect to Plaintiff's fall on September 30, 2011.  Plaintiff stands 6 feet, 9 inches tall and weighs over 300 pounds.  (*Id.* ¶ 50.)  On September 30, 2011, Plaintiff was housed in Building F, Section A of SCI-Smithfield.  (*Id.* ¶ 39.)  The dining hall is one of the many areas of the prison that is inspected weekly, monthly, and annually.  (*Id.* ¶ 41.)  Further, DOC staff routinely walk through the dining area for various inspections.  (*Id.* ¶ 34.) The table at issue in the dining hall is a singular structure consisting of a table top with a centrally located vertical stem that is affixed to a round plate that fastens to the floor by way of four (4) bolts.  (*Id.* ¶ 35.)  The four (4) circular seats are affixed to pipes that attach to the stem, and are not that high off the floor.  (*Id.* ¶¶ 36, 51.)  Further, the plate that fastens to the floor is 3/4 inch thick.  (*Id.* ¶ 37.)  Also, the bolts are 2-1/2 inches long and fit into two (2) inch casings embedded into the floor.  (*Id.* ¶ 38.) Plaintiff adds that years of water getting underneath the tables has rusted the bolts. (Doc. 100 ¶ 29.)

According to the meal rotation schedule, numerous other housing units would have had dinner in the dining hall prior to Plaintiff that day.  (Doc. 94 ¶ 40.)  None of the relevant reports from that time period show that loose dining tables were an issue

3

or an ongoing issue. (*Id*. ¶ 42.) Reports do show that, after the September 30, 2011 incident, efforts were made to be proactive in identifying problem tables and removing or repairing as needed. (*Id*. ¶ 43.) Further, a review of work orders indicates that the September 30, 2011 incident was the first time such an incident occurred where a table came loose from the floor. (*Id*. ¶ 44.) Plaintiff counters that the weekly walk through reports by the kitchen staff differ from the work orders for the dining hall. (Doc. 100 ¶ 20.) In addition, the monthly inspection reports do not correlate with the work orders. (*Id*. ¶ 19.)

DOC Defendants assert that, prior to the September 30, 2011 incident, Plaintiff never notified them of any problems or concerns he had with dining hall tables or chairs. (Doc. 94 ¶ 29.) Further, prior to this incident, no DOC Defendant was aware of any like incidents with dining hall tables or chairs. (*Id*. ¶ 30.) DOC Defendants assert that, had Plaintiff or any other inmate or staff notified any of them, appropriate action would have been taken, such as removing the table, chair, or making requisite repairs. (*Id*. ¶ 31.) They further assert that Plaintiff does not have any evidence that other inmates suffered the same experience with the dining hall table breaking loose from the floor. (*Id*. ¶ 63.) Plaintiff counters that, prior to this incident, he notified DOC Defendants of his concerns with the tables and flooring in the inmate dining

hall.[2]  (Doc. 100 ¶ 9.)  He also asserts that all DOC Defendants either attended, or

were represented at, committee safety meetings.  (*Id*. ¶ 26.)  He adds that Defendant

Rohrer himself knew of the problems in the inmate dining hall, including those with

the tables and flooring, as far back as 2006, and authored relevant work orders.  (*Id*. ¶

24.)  In addition, no work order was submitted for the table relating to the September

30, 2011 incident.  (*Id*. ¶ 28.)  A review of these inspection and work order records,

however, reveals that, while there were ongoing problems with the kitchen, in

---

[2]  Plaintiff cites to Exhibits R and S of his counter statement of facts to support his
statement that he informed officials of the conditions of the dining hall table prior to the September
30, 2011 incident, as well as the conditions of the infirmary cell prior to October 3, 2011.  (*See* Doc.
100 ¶ 9) (citing Doc. 100-19, Ex. R; Doc. 100-20, Ex. S.)  However, Exhibit R is DOC Defendants'
brief in opposition to Plaintiff's motion to compel and DOC Defendants' supplemental answer to
Plaintiff's request for production of documents.  (Doc. 100-19, Ex. R.)  Plaintiff's Exhibit S is a final
appeal decision of the Secretary's Office of Inmate Grievances and Appeals, dated December 12,
2012, addressing Plaintiff's appeal from the denial of a grievance related to an August 2012 search
of Plaintiff's cell.  (Doc. 100-20, Ex. S.)  Neither of these exhibits supports Plaintiff's statement that,
prior to the September 30, 2011 fall from the dining table, Plaintiff informed prison officials of his
concerns with the conditions of the tables.  These exhibits also do not support Plaintiff's statement
that he informed officials of his concerns with the infirmary cell prior to October 3, 2011.
Furthermore, a review of the record, including Plaintiff's unsubstantiated and unsworn declaration,
(Doc. 100-25, Ex. W, Pl. Unsworn Decl.), as well as Plaintiff's deposition, (Doc. 95, Ex. A, Pl.
Depo., 2/19/2014), reveals no other support for Plaintiff's statement.  For example, Plaintiff's
blanket statement that, prior to his fall, he "would complain [verbally and/or in writing] about the
condition of the tables," (*Id*. at 15), is not supported by any documentation in the record.  Further, to
the extent that Plaintiff claims that some of his legal materials in support of this case were
confiscated, in the final appeal decision of the Secretary's Office of Inmate Grievances and Appeals
from Plaintiff's grievance relating to a search of his cell in 2012, the Secretary's Office found that
"staff did not take your legal materials and there is no evidence that proves these claims."  (Doc.
100-20, Ex. R, Final Appeal Decision.)

particular the kitchen floor, there were no ongoing problems noted with the dining hall tables.  (Doc. 95, Exs. M-Q, Inspection and Work Order Records.)

Turning to the second instance, Plaintiff alleges in his amended complaint that, after he fell in the dining hall on September 30, 2011, he was transported to the medical department and examined by a physician's assistant.  (Doc. 44 ¶ 16.)  He was told that he had no swelling or lumps to the back of his head, although it was tender.  (*Id*.)  He was also told that he had suffered a muscle strain to his lower back.  (*Id*.)  He was treated with valium and ibuprofen, his wrist was wrapped, and he was sent to his housing unit.  (*Id*.)

Plaintiff further alleges that, in the early morning hours of October 1, 2011, he was removed from his cell by a stretcher and eventually taken to Blair County Hospital for lower back pain and left leg numbness and pain.  (*Id*. ¶ 17.)  X-rays revealed no broken bones, but the doctor stated nerve and/or ligament damage could not be ruled out.  (*Id*.)

Upon his return to SCI-Smithfield, Plaintiff alleges that he was informed that Drs. Doll and Long had been contacted and he was then placed in an observation cell in the intake housing unit which was being used as a temporary infirmary.  (*Id*. ¶ 18.)  Dr. Long prescribed valium and vicodin.  (*Id*.)  The observation cell was not equipped to meet Plaintiff's needs, with no help call button or support rails.  (*Id*.)  On October

6

3, 2011, Plaintiff lost consciousness and fell in this cell while attempting to use the bathroom and after suffering "a paralyzing lower back and leg pain." (*Id*.)  Plaintiff was discovered by an officer making his rounds and was taken again to Blair County Hospital for x-rays and a CT scan.  (*Id*.)

DOC Defendants and Medical Defendants provide the following material facts with respect to Plaintiff's fall on October 3, 2011.  At SCI-Smithfield, there are eight (8) cells in the main infirmary area, and four (4) psychiatric observation cells and seven (7) overflow medical cells in the annex area.  (Doc. 94 ¶ 45.)  All of the cells in the infirmary are handicapped-accessible in the same manner as an outside hospital ward.  (*Id*. ¶ 46.)  However, none of the handicapped cells are equipped to afford an inmate with a disability the ability to function fully independently.  (*Id*.)  Plaintiff's medical records do not indicate that he was considered disabled on October 3, 2011. (*Id*. ¶ 47.)

When Plaintiff returned from Blair County Hospital on October 1, 2011, Defendant Dr. Doll ordered his temporary placement in Inmate Housing Unit ("IHU") Cell #6 because he was complaining of pain and the infirmary had nursing staff who could observe and evaluate his condition.  (Doc. 84 ¶¶ 4-7.)  Plaintiff asserts that this cell, located in the annex area, was unequipped to meet his needs due to lack of bed space.  (Doc. 100 ¶ 15.)  However, Dr. Doll thought Plaintiff could be observed in this

cell by the nursing staff and would be encouraged to remain active and ambulating. (Doc. 84 ¶¶ 4, 6, 7.)  Plaintiff understood that Dr. Doll wanted him to move around because he probably sustained a muscle pull as a result of the fall from the dining table on September 30, 2011.  (*Id*. ¶ 8; Doc. 95 at 10, Pl. Dep., 2/19/2014 ("I know [Dr. Doll] wanted me to move around, is what she said.  It was probably a muscle pull or something of that nature.").)

IHU Cell #6 is approximately eight (8) feet by twelve (12) feet.  (Doc. 94 ¶ 56.) The cell has a bed with a mattress and a toilet.  (*Id*. ¶ 57.)  The bed and toilet are in very close proximity to each other.  (*Id*. ¶ 48.)  Inmates are provided meals and medication as needed.  (*Id*. ¶ 58.)  Staff visually check on inmates every fifteen (15) minutes.  (*Id*. ¶ 49.)  Plaintiff disputes this fact, asserting that records do not indicate visual fifteen (15) minute checks by medical staff.[3]  (Doc. 100 ¶ 31.)

Medical records indicate that Plaintiff was cleared for use of a cane on October 2, 2011, at 10:55 a.m.  (Doc. 94 ¶ 60.)  However, the records also indicate that Plaintiff was not issued a cane for temporary use until October 5, 2011.  (Doc. 100-9, Ex. H, Health Care Item Receipt.)  At approximately 4:00 a.m. on October 3, 2011, Plaintiff fell in his cell when he attempted to move from his bed to the toilet.  (Doc. 94

---

[3]  The "records" to which Plaintiff refers here are Plaintiff's own Medications Administrative Records that record the medications prescribed to Plaintiff.  (Doc. 100, Ex. I, Medications Records.)  It does not appear that these records would contain notations as to staff movement in the infirmary annex area.

¶ 55.)  After this fall, Plaintiff was taken to Blair County Hospital for treatment.  (Doc. 84 ¶ 9.)  Upon his return to SCI-Smithfield, he remained in the infirmary until October 5, 2011.  (*See* Doc. 44 ¶ 9.)

DOC Defendants assert that none of them had anything to do with placing Plaintiff in that particular infirmary cell in which he fell on October 3, 2011.  (Doc. 94 ¶ 32.)  They also assert that none of them were involved in approving or disapproving, or providing or denying, Plaintiff the use of a walking assistance device such as a cane or crutches while in the infirmary.  (*Id.* ¶ 33.)  For his part, Plaintiff asserts, without support,[4] that, prior to the October 3, 2011 fall, he notified DOC Defendants of his concerns relating to the conditions of the cell in the infirmary.  (Doc. 100 ¶ 9.)

As to the filing of grievances related to the conditions of both the dining hall table and the infirmary, DOC Defendants assert that Plaintiff filed only two (2) grievances related to the September 30, 2011 and October 3, 2011 falls.  (Doc. 94 ¶ 22.)  On October 11, 2011, Plaintiff filed Grievance No. 384673.  (*Id.* ¶ 23.)  In that grievance, Plaintiff stated, *inter alia,*

> On 9-30-11 I sat at a dining hall table to eat my evening meal when the whole table snapped from the floor mount, causing it to topple over on me as I fell backwards on my back and wrist.  The table weighing about 300 pounds, also made contact with my legs.  I am suffering with

---

[4]  *See supra* note 2, at 5.

injuries to my back, wrist, and legs, due to this incident.  I am now
walking with a cane to help support me so I don't further injure myself.

After viewing how and why the table snapped from its mount to
the floor, it was clear that the base of the table was full of rust and the
bolts supporting it were rusted away.  Furthermore, it was visible for all
to see that someone tried to cover it up with paint.  There are about 10
other tables in the dining hall in the same condition, exposing inmates to
unreasonable and foreseeable risk to health and safety.

* * *

If Supt. Fisher, Ms. Hannah, and James Rouse had properly
inspected and maintained these tables, the incident would not have
occurred, and further injuries could be prevented to other inmates due to
the rusting of mounting bolts.

* * *

Due to the injuries received on 9-30-11 I was placed in the IHU
due to lack of bed space in the infirmary.  I was being given valium and
vicodin for pain.  While attempting to use the toilet I experienced severe
spasms in my back without anything to support myself I fell to the floor,
banging my head and landing on my back.  I was unable to move and laid
there for 5 to 10 minutes before a C.O. came by on his rounds.  I was
taken to the outside hospital in severe pain on 10-3-11.

(Doc. 95 at 36-37, Ex. D, Grievance 384673 Records.)

The Deputy Superintendent for Facilities Management upheld in part and

denied in part the grievance, concluding:

The table bases are bolted to the floor with the Steel bolts
imbedded in a lead shield embedded in a 3 to 4 inch concrete base under
the floor.  This anchor method has proven to be appropriate since

10

members mentioned in this grievance and they all state they would have immediately ordered the replacement of any table they felt was unsafe for use.  Contrary to inmate Green's claims otherwise, I find no reason to believe this was a foreseeable incident which could have been prevented.  The table which failed was used multiple times during morning and afternoon mainline on the day in question with no indication given by anyone that the table was loose or ready to fail.  This incident was an unfortunate accident that occurred without any malicious intent to place any inmate in harm's way.

Inmate Green was place[d] in the IHU for observation purposes, according to the medical professionals.  [T]here was no reason to believe that inmate Green would be unable to properly ambulate around the cell without the assistance of a medical device.  When inmate Green reported to staff that he was in pain he was sent out to the hospital for precautionary tests.  The X-rays and CT Scan failed to show any injuries to inmate Green.  Because inmate Green continued to allege pain, medical provided the use of a cane as a precautionary measure, (not as a result of any abnormalities found in his test).

I sustain the grievance in the fact that the accident did occur; however, I deny the grievance where inmate Green claims his constitutional rights were violated.  I find no gross negligence or attempt to cover up any know[n] abnormalities which would place anyone in unnecessary danger.  Inmate Green was provided professional medical assistance immediately after the accident and continues to be reviewed as needed.  I find no reason to award inmate Green any damages, (monetarily or non-monetarily).

(*Id*. at 38-39.)  In addition, Warden Fisher upheld Plaintiff's appeal from this response, finding,

None of the staff members you specifically name had knowledge of this incident beforehand.  Had anyone known, the tables would have been taken off-line until repaired.  As mentioned, these tables seat

11

> hundreds of inmates throughout the course of a week, and there was no
> way of having prior knowledge that one table was working its way loose
> from the base.  Being that these tables have been in place over 23 years,
> concerns do exist that possibly more tables could be in need of repair.  A
> thorough check of all tables has occurred since this incident and all
> appear stable at this time.  However, I have directed maintenance staff to
> remove each table and re-drill/re-secure each base into the floor.  This
> action will take away any chance of a rusted base or rusted bolts faltering
> again.

(*Id*. at 40.)  Plaintiff's final appeal to the Secretary's Office of Inmate Grievances and

Appeals was also denied for the reasons set forth by the institutional entities.  (*Id*. at

42.)

Plaintiff also filed Grievance No. 385361 on October 13, 2011.  (Doc. 94 ¶ 24.)

In this grievance, Plaintiff complains about the medical care he received after the falls

of September 30, 2011 and October 3, 2011.  (*Id*. at 44-45.)  Plaintiff's grievance and

subsequent appeals were denied.  (*Id*. at 46-51.)

Finally, during his deposition taken in connection with this matter, Plaintiff

acknowledged that he did not file a grievance about his placement in the IHU #6

observation cell.  (Doc. 95 at 9, Pl. Depo.)  When asked if he filed any such grievance,

Plaintiff responded, "Why would I file a grievance to be placed in observation?  I

mean, there was no reason, you know.  They took me out to the hospital, brought me

back, and said I would be held for observation.  Where's the grievance?"  (*Id*.)  He

further stated, "I didn't file - - once they placed me in that cell, I didn't file no

grievance because I felt as though they were treating me in the way or manner they saw fit.  Once I fell in the cell, a grievance was filed at that point." (*Id*. at 13.)

## B.   **Procedural History**

Plaintiff filed his original complaint and motion for leave to proceed *in forma pauperis* on May 24, 2012.  (Docs. 1 & 3.)  By order dated June 7, 2012, the court granted the motion to proceed *in forma pauperis* and directed service of the complaint on the Defendants named therein.  (Doc. 10.)

DOC Defendants filed a motion to dismiss the complaint and brief in support on July 11, 2012.  (Docs. 20 & 21.)  Medical Defendants filed a motion to dismiss and supporting brief on July 16, 2012.  (Docs. 23 & 24.)  Plaintiff filed briefs in opposition to these motions on July 25, 2012, and August 1, 2012, respectively. (Docs. 26 & 28.)  Medical Defendants filed a reply brief on August 8, 2012.  (Doc. 30.)  Further, after being granted an extension of time to file, (*see* Doc. 27), Plaintiff filed a certificate of merit on August 8, 2012, (Doc. 29), in which he asserted that expert testimony was not necessary for litigation of his claims.  Thereafter, on February 22, 2013, the court granted the motions to dismiss with prejudice in part and without prejudice in part.  (Doc. 37.)  Further, Plaintiff was permitted to amend his complaint as to those claims that were dismissed without prejudice.  (*Id*.)  Notably, in light of the court's decision to afford Plaintiff that opportunity to amend his complaint

as to his federal constitutional claims, the court retained jurisdiction over Plaintiff's

pendant state law claims for the convenience of the parties.  (*See id*. at 28-30.)

Plaintiff filed his amended complaint on May 1, 2013.  (Doc. 44.)  On May 7,

2013, Medical Defendants filed a motion to dismiss.  (Doc. 45.)  On May 13, 2013,

DOC Defendants filed a motion to dismiss.  (Doc. 48.)  After responsive and reply

briefing were filed, the court granted in part and denied in part the motions to dismiss

by order dated January 8, 2014.[5]  (Doc. 66.)  By separate order dated January 8, 2014,

the court scheduled various case management deadlines.  (Doc. 67.)  After answering

the amended complaint, both sets of Defendants filed separate motions for summary

judgment.  (Doc. 79 & 92.)  After responsive and reply briefing were filed, the

motions for summary judgment are now ripe for disposition.


## II.    <u>Standard of Review</u>

---

[5]  Specifically, the court granted in part and denied in part those motions to dismiss as follows: (1) the Eighth Amendment conditions of confinement claim relating to the dining hall table was dismissed as to Defendants Driebelbis, Doll, Long, and Corizon; (2) the Eighth Amendment medical-care deliberate indifference claim was dismissed as to all Defendants; (3) the negligence claim relating to the condition of the dining hall table was dismissed as to Defendants Driebelbis, Doll, Long, and Corizon; (4) the medical negligence/medical malpractice claim was dismissed as to all Defendants; (5) the negligent supervision claim was dismissed as to Medical Defendants Doll, Long, and Corizon; (6) the negligence claim relating to the conditions of the infirmary was dismissed as to Defendant Corizon; and (7) Defendant Corizon was dismissed as a party.  (*See* Doc. 66.)

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting a motion for summary judgment.  Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id*.  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex*, 477 U.S. at 324.  "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  The non-moving party

may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.   Discussion

A plaintiff, in order to state a viable § 1983 claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege,

16

or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). A defendant's conduct must have a close causal connection to plaintiff's injury in order for § 1983 liability to attach. *Martinez v. California*, 444 U.S. 277, 285 (1980).[6] A prerequisite for a viable civil rights claim is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). On its face, § 1983 creates no exceptions to the liability it imposes, nor does it speak of immunity for any individual who might deprive another of civil rights. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). Nevertheless, it is well-settled that certain government officials possess immunity from § 1983 liability. *Id*.

As stated above, there are two motions for summary judgment pending in the instant case. In the DOC Defendants' motion, they argue that summary judgment should be granted in their favor on the following grounds: (1) Plaintiff has failed to establish that DOC Defendants were deliberately indifferent with respect to the conditions of his infirmary cell; (2) Plaintiff has failed to establish that DOC Defendants were deliberately indifferent with respect to the conditions of the dining hall table; (3) Plaintiff failed to properly exhaust his administrative remedies with

---

[6]  The Court in *Martinez* explained: "Although a § 1983 claim has been described as 'a species of tort liability,' *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L. Ed. 2d. 128 [(1976)], it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." *Martinez*, 444 U.S. at 285.

respect to the conditions of his infirmary cell; (4) Plaintiff has failed to establish DOC Defendants' negligence with respect to the conditions of the infirmary cell; and (5) Plaintiff has failed to establish DOC Defendants' negligence with respect to the conditions of the dining hall table.  (*See* Doc. 93.)  In the Medical Defendants' motion, they argue that summary judgment should be granted in their favor on the following grounds: (1) Plaintiff has not established that Medical Defendants were deliberately indifferent with respect to the conditions of his infirmary cell; and (2) Plaintiff has not established that Medical Defendants were negligent with respect to Plaintiff's placement in the infirmary cell.  (*See* Doc. 80.)

The court will address DOC Defendants' argument related to exhaustion of administrative remedies first, as exhaustion is a threshold issue.  Further, for the reasons set forth below, summary judgment will be granted in favor of Defendants as to Plaintiff's Eighth Amendment conditions of confinement claims relating to the dining hall table and the infirmary cell.  Because the court will dismiss all federal claims over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over Plaintiff's pendant state law claims.

### A.    **Exhaustion of Administrative Remedies**

DOC Defendants argue that Plaintiff's claims related to the conditions of the infirmary cell should be dismissed based on Plaintiff's failure to exhaust his

18

administrative remedies, as required by the Prison Litigation Reform Act of 1995

("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996).

The PLRA requires a prisoner to present his claims through an administrative

grievance process before seeking redress in federal court.  The act specifically

provides as follows:

> No action shall be brought with respect to prison conditions under section
> 1983 of this title, or any other Federal law, by a prisoner confined in any
> jail, prison, or other correctional facility until such administrative
> remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  A prisoner must exhaust administrative remedies as to any

claim that arises in the prison setting, regardless of any limitations on the kind of relief

that may be gained through the grievance process.  *See Porter v. Nussle*, 534 U.S. 516,

532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[I]t is beyond the

power . . . of any . . . [court] to excuse compliance with the exhaustion requirement,

whether on the ground of futility, inadequacy or any other basis."  *Nyhuis v. Reno*, 204

F.3d 65, 73 (3d Cir. 2000) (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp 2d

884, 894-95 (S.D.N.Y. 1998) (citing *Weinberger v. Salfi*, 422 U.S. 749, 766 (1975)).

The PLRA "completely precludes a futility exception to its mandatory exhaustion

requirement."  *Nyhuis*, 204 F.3d at 71.  The PLRA also mandates that an inmate

"properly" exhaust administrative remedies before filing suit in federal court.

*Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  "Proper exhaustion demands compliance

19

with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id*. at 90-91.  Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id*. at 93 (quoting *Nussle*, 534 U.S. at 525).  Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim.  *Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004).

A prisoner does not have to allege in his complaint that he has exhausted administrative remedies.  *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).  Failure to exhaust available administrative remedies is an affirmative defense.  *Id*.  Therefore, it must be pleaded and proven by the defendants.  *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

The Pennsylvania DOC has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. 37 Pa. Code § 93.9(a); *see also* www.cor.state.pa.us, DOC Policies, Policy No. DC-ADM 804, Inmate Grievance System.  After an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance

Coordinator for initial review.  An inmate may then appeal an adverse decision of the Grievance Coordinator to the Superintendent of the institution, and can finally appeal to the Secretary of the DOC Office of Inmate Grievances and Appeals.  *See Booth v. Churner*, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process).

In this case, DOC Defendants argue that summary judgment should be granted in their favor as to Plaintiff's claim relating to the conditions of the infirmary cell because he failed to raise the claim through the prison's administrative grievance process, and therefore it is not exhausted.  Specifically, they contend that Plaintiff merely stated in his grievance that, while attempting to use the toilet, he experienced spasms and, without anything to support himself, he fell to the floor.  This statement, they argue, does not adequately raise the specific claim Plaintiff now asserts.

In Grievance No. 384673, Plaintiff states that he was placed in the IHU infirmary cell "due to lack of bed space in the infirmary." (Doc. 95 at 37.)  In addition, he states, "[w]hile attempting to use the toilet I experienced severe spasms in my back without anything to support myself I fell to the floor, banging my head and landing on my back."  (*Id*.)  In a response to the grievance, the Deputy Superintendent stated, "there was no reason to believe that inmate Green would be unable to properly ambulate around the cell without the assistance of a medical device."  (*Id*. at 39.)

In his brief in opposition, Plaintiff counters that he did, in fact, raise this claim in the grievance referenced above.  He argues that, by referencing the lack of bed space and "anything" to support himself, he put Defendants on notice of his claim relating to an unsafe environment in violation of the Eighth Amendment.  (*See* Doc. 99.)  In light of Plaintiff's assertions and in an abundance of caution to the rights of this *pro se* plaintiff, the court will not dismiss this claim for failure to exhaust  through the administrative grievance process.  Rather, this claim will be addressed herein on the merits.

### B.      Eighth Amendment Claims

The Eighth Amendment prohibition against cruel and unusual punishment demands that prison officials do not house inmates under conditions that deprive them of one or more basic human needs, such as the basic human need for reasonable safety, adequate physical space, and the need for some degree of ventilation and fresh air.  *Helling v. McKinney*, 509 U.S. 25, 32 (1993).  However, the Eighth Amendment does not mandate that prisons be free of discomfort.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only

22

when they "involve the wanton and unnecessary infliction of pain."  *Rhodes*, 452 U.S. at 347.

The United States Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement.  First, under the "objective component," a prisoner must prove that the condition he complains of is "sufficiently serious" to violate the Eighth Amendment.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The challenged condition must be "extreme."  *Id*. at 9.  While an inmate "need not await a tragic event" before seeking relief, *Helling*, 509 U.S. at 33, he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety, *id*. at 35. Moreover,

> the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused by exposure to [the challenged condition of confinement].  It also requires a court to assess whether society considers the risk that a prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id*. at 36.  The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] . . . of the minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347.

23

Second, a prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Hudson*, 503 U.S. at 8 (citations omitted). The proper standard is that of deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Negligence does not suffice to satisfy this standard, *id*. at 305, but a prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result," *Farmer*, 511 U.S. at 835. In defining the deliberate indifference standard, the *Farmer* Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id*. at 837. Further, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844.

Finally, it is well established that personal liability under § 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. *See, e.g.*, *Rizzo v. Goode*, 423 U.S. 362, 368 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). It is also well settled in the Third Circuit that the defendant's personal involvement in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal

involvement. *Hampton*, 546 F.2d at 1082. As the Court stated in *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998):

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode*, 845 F.2d at 1207 (citations omitted).

In the instant case, DOC Defendants argue that Plaintiff has failed to establish Eighth Amendment conditions of confinement claims relating to the dining table and the infirmary. The Medical Defendants argue that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim relating to the infirmary. The court will discuss these claims *seriatim*.

### 1. Dining Hall Table

In his amended complaint, Plaintiff alleges that, on September 30, 2011, he entered the dining hall and was directed to sit on "what was obviously an unstable table" after he collected his food tray. (Doc. 44 ¶ 15.) When he sat down, the table snapped from its floor foundation and Plaintiff fell to the floor, injuring himself. (*Id.* ¶¶ 15, 16.) DOC Defendants argue that Plaintiff has failed to prove that they were deliberately indifferent with respect to the condition of the dining hall table. Upon careful review, the court agrees with DOC Defendants.

25

First, Plaintiff's allegations do not satisfy the first prong of the Supreme Court's test for conditions of confinement claims because he has failed to show the condition of the dining hall table was "sufficiently serious" to violate the Eighth Amendment. *Hudson*, 503 U.S. at 8. The undisputed facts demonstrate that the dining hall is inspected weekly, monthly, and annually. Staff routinely walk through inspecting the area. The table at issue was fastened to the floor by way of four (4) bolts. Further, that table was used earlier on September 30, 2011, for breakfast and lunch without incident. In addition, several other housing units used that table for dinner on that day prior to Plaintiff. In fact, there is no dispute that this instance was the first in which a table broke loose from the floor. In sum, the record shows that the prison complied with constitutional standards at the most basic level, and Plaintiff has not provided any evidence from which a reasonable jury could conclude that he was deprived of the "minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, or that his health and safety were at risk, *Hassine v. Jeffes*, 846 F.2d 169, 174-75 (3d Cir. 1988), with respect to this dining hall table.

Turning to the subjective component of the test for a conditions of confinement claim, Plaintiff has failed to show that any of the DOC Defendants were aware of any prior incidents involving the dining hall tables coming loose from the floor. The inspection and work order records show ongoing work in the kitchen, particularly the

kitchen floor, (*see* Doc. 95, Exs. M-Q), but do not reveal any potentially hazardous issues with the dining hall tables.  Further, Plaintiff has not shown that any of the DOC Defendants ordered Plaintiff to sit at that particular dining hall table.  Without more, Plaintiff cannot show that any DOC Defendant "acted with a sufficiently culpable state of mind" with regard to the condition of the dining hall table.  *Hudson*, 503 U.S. at 8.

The court further notes that the accident Plaintiff complains of here, namely falling to the floor when the dining hall table came unbolted from the floor, involves, at best, negligence, and therefore does not rise to the level of a constitutional violation under either the Fourteenth or Eighth Amendments.  *See Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("We think the actions of prison custodians in leaving a pillow on the prison stairs, . . . are quite remote from the concerns [of the Due Process Clause] just discussed.  Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person.  To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law.");  *Boulware v. Fouse*, Civ. No. 3:12-CV-0408, 2012 WL 1183723, at *2 (M.D. Pa. Apr. 9, 2012) (mere negligence resulting in a prisoner falling to the floor when a dining table came unbolted from the floor does not rise to the level of an Eighth Amendment

27

violation); *Williams v. Bricker*, No. 96-1532, 1996 WL 94811, at *1 (E.D. Pa. Mar. 4, 1996) ("Plaintiff's allegations against defendant Bricker for allowing a staircase to exist in an unsafe condition constitutes, at best, a negligence claim.").

Because Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim against the DOC Defendants with respect to the conditions of the dining hall table, the court will grant summary judgment here in favor of DOC Defendants.

### 2.   **Infirmary Cell**

In his amended complaint, Plaintiff alleges that the observation cell in the infirmary in which he was housed from October 1 through 5, 2011, was not equipped with necessities such as a help call button or support rails.  (Doc. 44 ¶ 18.)  As a result of such an unsafe environment, Plaintiff alleges, he fell and injured himself while trying to move from the bed to the toilet.  (*Id.*)  Both sets of Defendants argue that Plaintiff has failed to demonstrate prison conditions here that rise to the level of an Eighth Amendment violation.  Upon careful review, the court agrees with Defendants.

First, Plaintiff's allegations do not satisfy the first prong of the Supreme Court's test for a conditions of confinement claim because he has failed to show the conditions in the infirmary cell were "sufficiently serious" to violate the Eighth Amendment. *Hudson*, 503 U.S. at 8.  The conditions he challenges - an infirmary cell with no help

28

call button or support rails, but visual checks by staff every fifteen (15) minutes, as

well as the provision of meals and appropriate medications - do not violate

contemporary standards of decency, and thus, do not amount to cruel and unusual

punishment under the Eighth Amendment. *See Brown v. Pastrana*, 446 F. App'x 270,

272 (11th Cir. 2011) (sleeping approximately eight feet above the floor without a

panic button or railings does not violate contemporary standards of decency); *Garner*

*v. City of Philadelphia*, Civ. No. 11-CV-5960, 2013 WL 4401327 (E.D. Pa. Aug. 16,

2013) (lack of active panic button in cell does not constitute a deprivation of a

"minimal civilized measure of life's necessities").  Rather, as both sets of Defendants

assert, the cell in which Plaintiff was housed was in a location where he could receive

medical monitoring by staff who would make rounds every fifteen (15) minutes, and

he had ongoing communication with that staff.  Plaintiff himself acknowledges that

there was no reason to file a grievance regarding the conditions of the observation cell

before his October 3, 2011 fall, as he was being treated properly.  Overall, the record

shows that the prison complied with constitutional standards at the most basic level,

and Plaintiff has not provided any evidence from which a reasonable jury could

conclude that he was deprived of the "minimal civilized measure of life's necessities,"

*Farmer*, 511 U.S. at 834, or that his health and safety were at risk, *Hassine v. Jeffes*,

846 F.2d 169, 174-75 (3d Cir. 1988).

Plaintiff has also failed to meet his burden under the subjective component of the test for conditions of confinement claims.  Initially, the court finds that Plaintiff has failed to produce evidence that any of the DOC Defendants were involved in placing him in the IHU Cell #6 between October 1 and 5, 2011.  Thus, DOC Defendants have no personal involvement in this aspect of the case and summary judgment here will be granted in their favor.

In fact, Plaintiff acknowledges that it was Defendant Dr. Doll who ordered his temporary placement in the cell.  (*See* Doc. 84 ¶¶ 4-7.)  Dr. Doll ordered this placement because Plaintiff was complaining of pain and the infirmary had nursing staff who could observe and evaluate his condition, while also ensuring that he was remaining active and ambulating.  (*Id*.)  Plaintiff does not dispute this fact.  (*Id*. at 8; Doc. 95 at 10.)  Dr. Doll's action here, specifically her order to have Plaintiff's condition monitored in a medical area of the prison rather than simply leaving Plaintiff in general population, does not rise to the level of deliberate indifference to satisfy the subjective component of a conditions of confinement claim.

Finally, Medical Defendants argue that Plaintiff has failed to demonstrate that Dr. Long had personal involvement with respect the decision to place Plaintiff in the infirmary cell.  However, attached to Plaintiff's brief in opposition to Medical Defendants' motion for summary judgment is former Defendant Driebelbis's answer

30

to Plaintiff's interrogatories in which he states the Dr. Long is involved in the decision-making process regarding Plaintiff's housing arrangements in the infirmary. (*See* Doc. 88-1 at 5, Ex. A, Def. Driebelbis Resp. to Pl.'s Interrog. No. 14.)  Even so, Plaintiff has still failed to produce evidence that Defendant Dr. Long acted with a "sufficiently culpable state of mind" with regard to the condition of the infirmary cell. *Hudson*, 503 U.S. at 8.  Simply stated, and particularly in light of the fact that Plaintiff has failed to show the objective component of this conditions of confinement claim, Plaintiff has not established that Dr. Long knew of and disregarded an excessive risk to Plaintiff's health and safety with regard to Plaintiff's placement in the infirmary cell.  *Farmer*, 511 U.S. at 837.

Because Plaintiff has failed to establish a conditions of confinement claim against any of the Defendants with respect to the conditions of the infirmary cell, the court will grant summary judgment here in favor of all Defendants.

### C.   <u>Jurisdiction Over Plaintiff's Negligence Claims</u>

Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim" if, *inter alia*, "the district court has dismissed all claims over which is has original jurisdiction . . . ."  This decision concerning the exercise of supplemental jurisdiction is left to the sound discretion of the district court.  *See Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (citing

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  In addition, when the claim is dismissed by the district court prior to trial pursuant to a provision such as § 1367(c)(3), "the district court must decline to decide the pendant state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Id.* (citing *Lovell Mfg. v. Export-Import Bank of the United States*, 843 F.2d 725, 732 (3d Cir. 1988); *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284 (3d Cir. 1993)).  The Third Circuit has also noted that a district court should decline jurisdiction over such claims "where the federal claims are no longer viable, absent extraordinary circumstances."  *Shaffer v. Bd. of Sch. Directors of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (citing *Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir. 1982) (internal quotations omitted)).

Here, the court finds that no extraordinary circumstances exist to justify maintaining jurisdiction over Plaintiff's pendant state law claims against the Defendants.  Since the court has now determined that all of Plaintiff's federal claims fail and therefore summary judgment will be granted in favor of all Defendants, the court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  Plaintiff's negligence claims will be dismissed without prejudice to Plaintiff's right to pursue them in state court.

## IV.  **Conclusion**

For the reasons set forth above, summary judgment will be granted in favor of all Defendants.  Further, Plaintiff's pendant state law claims will be dismissed without prejudice to Plaintiff's right to pursue them in state court.

An appropriate order follows.

_____s/Sylvia H. Rambo_____
United States District Judge

Dated:  November 19, 2014.